**ALTECH CONTROLS CORPORATION and Richard Alsenz, Plaintiffs,**

v.

**E.I.L. INSTRUMENTS, INC., Defendant.**

**No. Civ.A. H–92–3189.**

United States District Court, S.D. Texas, Houston Division.

Sept. 9, 1999.

---

David S. Wise, Sulzer Medica USA Inc., Houston, TX, Ned L. Conley, Houston, TX, Randy J. McClanahan, McClanahan & Associates, Houston, TX, Neal Elton Dry, Dry & Tassin, Houston, TX, for Plaintiffs.

Albert Berton Deaver, Jr., Arnold White & Durkee, Houston, TX, Michael O. Sutton, Sidley & Austin, Dallas, TX, John R. Schiffhauer, Fish & Richardson, Menlo Park, CA, Albert Berton Deaver, Jr., Arnold White & Durkee, Houston, TX, Michael O. Sutton, Sidley & Austin, Dallas, TX, for Defendants.

## ORDER

HARMON, District Judge.

Pending before the Court in the above referenced action, alleging patent infringement of three patents,[1] pursuant to Fed. R.Civ.P. 50, is, *inter alia*, Defendant E.I.L. Instruments, Inc.'s ("E.I.L.'s" or "Defendant's,") motion for judgment as a matter of law that '776 patent Claim 24 is invalid for having been offered for sale more than one year prior to the filing date of the '776 application (# 448).

### Prior Dispositive Rulings

There have been numerous dispositive rulings in the course of the litigation. On June 5, 1997, after a *Markman* hearing, this Court construed the scope of the patent claims and entered findings of fact and conclusions of law and granted summary

---

1. United States Patent No. 4,612,776 ("the '776 patent"), issued on September 23, 1986, United States Patent No. 4,628,700 ("the '700 patent"), issued on December 16, 1986, and United States Patent No. 5,067,326 ("the '326 patent"), issued on November 26, 1991.

judgment in favor of E.I.L. on literal infringement (# 324).[2] On December 3, 1997 the Court granted summary judgment also in favor of E.I.L. in concluding that the prosecution history estops Plaintiffs' claims of infringement of the asserted claims of the '776 patent by E.I.L.'s RC–1000 and RC–2000 under the doctrine of equivalency (# 354). The remaining portion of this case, dealing with infringement under the doctrine of equivalents, the validity of the '700 and '776 patents, and literal infringement of the '700 patent by E.I.L.'s RC–48, was tried to a jury from December 9–22, 1997. The jury found in favor of Plaintiffs Altech Controls Corporation ("Altech") and Richard H. Alsenz ("Alsenz") on all issues (# 408).[3] Subsequently, in response to Plaintiffs' motion for judgment as a matter of law that Defendant is not entitled to a defense of laches relating to the '776, '700, and '326 patents and motion for judgment as a matter of law that Defendant is not entitled to a defense of equitable estoppel relating to the '776 and '700 patents, the Court issued findings of fact and conclusions of law in favor of E.I.L. and its entitlement to prevail on both defenses of laches and equitable estoppel and denied both of Plaintiffs'

motions for judgment as a matter of law (# 444). In light of this background, the Court addresses the standard of review for the pending motion.

### Standard of Review

Under Federal Rule of Civil Procedure 50(a)(1), a district court may grant a judgment as a matter of law ("JMOL"), formerly known as a directed verdict, if after a party has been fully heard by the jury on an issue, "there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." *See Thomson, S.A. v. Quixote Corp.*, 166 F.3d 1172, 1174 (Fed.Cir.1999); *Conkling v. Turner*, 18 F.3d 1285, 1300 (5th Cir.1994). Upon a motion for JMOL, a district court must review a jury's resolution of factual issues to determine whether there is substantial evidence to support them. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975–76 (Fed.Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Only if the movant shows that when the correct legal standard is applied, there is not substantial evidence to support the finding in favor of the nonmovant, should the jury's

2. Specifically the Court concluded that because claims 1, 2, 3, 7, and 24 of the '776 patent are limited to the first-on/first-off ("FIFO") strategy, E.I.L.'s controller devices RC–1000 and RC–2000 do not literally infringe the asserted claims. Literal infringement of a patent requires that each feature of the patent claim is found in the accused device. *Texas Instruments, Inc. v, Cypress Semiconductor Corp.*, 90 F.3d 1558, 1563 (Fed.Cir. 1996), *cert. denied*, 520 U.S. 1228, 117 S.Ct. 1818, 137 L.Ed.2d 1027 (1997). In contrast, the other method of infringement under the doctrine of equivalents can be found only if the accused device contains elements identical or equivalent to each claimed element of the patented invention. *Id.* at 1566.

3. Specifically the jury found that the RC–48 controller literally and under the doctrine of equivalents infringed Claims 9, 10, and 14 of the '700 patent and that E.I.L. had actual knowledge of the '326 patent before December 20, 1993. With respect to E.I.L.'s defenses, the jury further found that E.I.L. did not prove by clear and convincing evidence that

the subject matter of claim 24 of the '776 patent was operable before July 31, 1978, that it was embodied in a controller offered for sale before July 31, 1978, and/or that an offer for sale before July 31, 1978 of a controller embodying the subject matter of claim 24 of the '776 patent was primarily for profit rather than for experimental purposes. In addition, the jury found that E.I.L. did not prove by clear and convincing evidence that claim 24, as a whole, of the '776 patent, and claims 9, 10, and 11, each as a whole, of the '700 patent, would have been obvious to a person of ordinary skill in the art at the time the invention was made. The instant motion, in essence, asks the Court to overturn that jury's verdict and find that the Claim 24 of the '776 patent is invalid because there is not substantial evidence to support the jury's finding that the invention of Claim 24 was not offered for sale before July 31, 1978 for profit and because E.I.L. has proven by clear and convincing evidence that the invention was on sale primarily for profit more than a year before Richard Alsenz applied for patent '776.

factual findings be overruled. *Id.* "Substantial evidence is 'such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review.'" *Texas Instruments, Inc. v. Cypress Semiconductor Corp.,* 90 F.3d 1558, 1563 (Fed.Cir.1996) (quoting *Perkin–Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 893 (Fed.Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984)), *cert. denied,* 520 U.S. 1228, 117 S.Ct. 1818, 137 L.Ed.2d 1027 (1997). In reviewing factual issues for substantial evidence, the court must inquire whether a reasonable jury, in light of the record before it viewed as a whole, could have arrived at the decision reached by the actual jury. *Dawn Equipment v. Kentucky Farms, Inc.,* 140 F.3d 1009 (Fed.Cir.1998). The court must review the evidence in a light most favorable to the nonmovant and make all reasonable inferences in support of the verdict for Plaintiffs. *Allied Colloids, Inc. v. American Cyanamid Co.,* 64 F.3d 1570, 1573 (Fed.Cir.1995). It must not weigh the evidence or consider the credibility of the witnesses, which are within the province of the jury. *Id.*

### On Sale Bar Under 35 U.S.C. § 102(b)

A patent is presumed valid and the party challenging its validity must overcome the presumption by proving by clear and convincing evidence that a patent is invalid. 35 U.S.C. § 282; *Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n,* 988 F.2d 1165, 1177 (Fed.Cir.1993), *dism'd,* 1994 WL 745517 (Fed.Cir.1994). Under the relevant portion of 35 U.S.C. § 102(b), "A person shall be entitled to a patent unless ... the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States...." The date one year prior to the patent application date is known as the "critical date." A sale or offer of sale prior to the critical date triggers the on-sale bar. Under Section 102(b), an inventor is not entitled to a patent on an invention that has been on sale more that one year before the inventor filed his patent application.[4] There is no dispute that the critical date for the '776 patent was July 31, 1978, since the application was filed on July 31, 1979, and therefore a sale or offer for sale of the claimed invention, a pressure controller used to control compressors in refrigeration systems, prior to that date may give rise to an on-sale bar and render claim 24 invalid.

The central meaning of the word "invention" in the statute is "the inventor's conception rather [ ] than a physical embodiment of that idea." *Pfaff v. Wells Electronics, Inc.,* 525 U.S. 55, 119 S.Ct. 304, 306, 142 L.Ed.2d 261 (1998). Because the statutory language does not require that the idea be reduced to practice[5] before it can be patented, it is well established that an invention may be patented before it is reduced to practice where it is described with sufficient clarity and precision to enable one of ordinary skill in the field to understand the process and construct the apparatus. *Id.* at 309. Nevertheless, the "invention" requires that the

---

4. The policies behind the patent system "encourage[ ] the creation and public disclosure of new and useful advances in technology in return for an exclusive monopoly for a limited period of time. The balance between the interest in motivating innovation and enlightenment by rewarding the invention with patent protection on the one hand, and the interest in avoiding monopolies that unnecessarily stifle competition on the other, has been a feature to the federal patent laws since their inception." *Pfaff,* 119 S.Ct. at 310. The on-sale bar serves to exclude "ideas that are in the public domain from patent protection and confin[e] the duration of the monopoly to the statutory term" by not allowing an inventor to delay taking out a patent and preserving a monopoly and using it for profit for himself for a longer period than is allowed under the patent statutes. *Id.*

5. "'A process is reduced to practice when it is successfully performed. A machine is reduced to practice when it is assembled, adjusted and used.'" *Pfaff,* 119 S.Ct. at 307 n. 2, quoting *Corona Cord Tire Co. v. Dovan Chemical Corp.,* 276 U.S. 358, 383, 48 S.Ct. 380, 72 L.Ed. 610 (1928).

concept be complete, not merely "substantially" complete.[6] *Id.* at 311. While reduction to practice is usually the best evidence that an invention is complete, it is not essential in all cases. *Id.*

In *Pfaff,* 119 S.Ct. at 311, the United States Supreme Court held that

the on-sale bar applies when two conditions are satisfied before the critical date. First, the product must be the subject of a commercial offer for sale. An inventor can both understand and control the timing of the first commercial marketing of his invention. The experimental use doctrine,[7] for example, has not generated concerns about indefiniteness, and we perceive no reason why unmanageable uncertainty should attend a rule that measures the application of the on-sale bar of § 102(b) against the date when an invention that is ready for patenting is first marketed commercially. . . .

Second the invention must be ready for patenting. That condition may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention.

*See also Weatherchem Corp. v. J.L. Clark, Inc.,* 163 F.3d 1326, 1332 (Fed.Cir.1998). Because of the need for a definite standard for determining with reasonable certainty by what date a patent application must be filed, the Supreme Court rejected as "unnecessarily vague" the multifactor "totality of the circumstances" test to determine whether the one-year period should be triggered. *Pfaff,* 119 S.Ct. at 311 n. 11; *Weatherchem,* 163 F.3d at 1333.[8] The Federal Circuit therefore follows the *Pfaff* two-part test without balancing the various policies that were involved in its past application of the totality of the circumstances test. *Weatherchem,* 163 F.3d at 1333.; *Brasseler U.S.A. I, L.P. v. Stryker Sales Corp.,* 182 F.3d 888, 890 (Fed.Cir.1999).[9]

6. In *Pfaff,* 119 S.Ct. at 308, the Supreme Court indicated that it granted certiorari because some courts have required that an "invention be substantially complete" at the time of the sale for the one-year sale bar period to run, while others required that the invention have been reduced to practice. In rejecting both approaches, the Supreme Court notes that §§ 101 and 102(b) do not mention "substantial completion" or reduction to practice as a requirement for an on-sale bar's grace period for a patent application to begin to run. The Supreme Court further observed that a "substantially complete" standard is not definite enough for an inventor to determine when a patent application must be filed. *Id.* at 311.

7. An inventor can show that an invention was not "on sale" prior to the critical date by demonstrating that the primary purpose for an offer for sale was experimental, and not commercial. "The experimental use doctrine operates in the inventor's favor to allow the inventor to refine his invention or to assess its value relative to the time and expense of prosecuting a patent application." *In re Hamilton,* 882 F.2d 1576, 1581 (Fed.Cir. 1989). To lift the one-year statutory bar, the inventor must show that he kept control over his invention while he continued testing it. *Id.* at 1580. With regard to both the public use doctrine and the on sale bar, "The invention may be 'put up and used in the premises of another,' and the use may even 'inure to the benefit of the owner of the establishment,' but the invention must be used under the 'surveillance' of the inventor, for the purposes of enabling him to 'test the machine,' to 'ascertain whether it will answer the purpose intended,' and to 'make such alterations and improvements as experience demonstrates to be necessary. .' " *Id.* at 1581.

8. Plaintiffs incorrectly argue earlier law that the applicability of the on-sale bar is determined by the underlying fact issues and the totality of the circumstances in view of the policies underlying § 102(b). Opposition (# 456) at 5.

9. As instances of the use of the earlier totality-of-the-circumstances test, the Federal Circuit cited *Envirotech Corp. v. Westech Eng'g, Inc.,* 904 F.2d 1571, 1574 (Fed.Cir.1990), *UMC Elecs. Co. v. United States,* 816 F.2d 647, 656 (Fed.Cir.1987) [, *cert. denied,* 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988) ], and *King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 860 (Fed.Cir.1985)[, *cert. denied,* 475

This Court must first determine whether in its normal use the "invention" offered for sale is within the scope of the patent claim, i.e., here whether it satisfies each limitation in Claim 24 and is thus an embodiment of the claimed invention. *Scaltech, Inc. v. Retec/Tetra, L.L.C.*, 178 F.3d 1378, 1383, 1384 (Fed.Cir.1999) (holding that the district erred in failing to determine whether an embodiment of the claimed invention was offered for sale). For an invention to be "on sale" within the meaning of § 102(b), there must be a definite sale or offer for sale of the claimed invention prior to the critical date. *Pfaff v. Wells Electronics, Inc.*, 124 F.3d 1429, 1433 (Fed.Cir.1997), *aff'd*, 525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998).[10] While the determination of whether a product was "on sale" in terms of 35 U.S.C. § 102(b) is a ultimately a question of law, the issue involves underlying questions of fact. *Id.* at 1423.

Under the first prong of the *Pfaff* test, this Court examines the evidence as a whole to determine whether substantial evidence supports the jury's finding that there was no actual sale or offer of sale prior to July 31, 1978. For comparison, in *Weatherchem*, the first appeal to the Federal Circuit following the Supreme Court's clarification of the on-sale bar in *Pfaff*, the Federal Circuit found evidence of at least three commercial transactions in signed purchase orders prior to the critical date in which a specified number of the subsequently patented caps were ordered with a price noted, constituting at least an offer of sale. 163 F.3d at 1333. *See Pfaff*, 119 S.Ct. at 306 (record evidence of a signed purchase agreement prior to the critical date establishes an offer for sale sufficient to invoke the on-sale bar).

Second, after the Court has determined that the invention offered for sale is within the scope of the patent claim, the Court must examine whether E.I.L. has shown that substantial evidence does not support the jury's finding that the invention was not ready for patenting at the time of the sale. In *Weatherchem*, the Federal Circuit examined whether the invention was sufficiently developed by the inventor to be ready for patenting. The Court focused on the inventor's testimony that he had made an early drawing of his invention before the offer for sale showing the invention with all the structural limitations set forth in the patent claim, " 'sufficiently specific to enable a person skilled in the art to practice the invention.' " *Weatherchem*, 163 F.3d at 1333, *quoting Pfaff*, 119 S.Ct. at 307. The Federal Circuit furthermore noted that Weatherchem produced several samples after the drawing and wrote the inventor a letter outlining changes to correct problems. The inventor testified that he would be able to have "all refinement work completed," while the purchaser characterized the modifications as "fine tuning." *Id.* at 1334. Moreover, the purchaser ordered a commercial quantity of the invention (275,000) before the critical date, reflecting its confidence that the invention was operative. *Id.* The Federal Circuit concluded that the invention was ready for patenting at the time of the early drawing. *Id.*

Where the premature sale of the product embodying the patented invention

---

U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986).] *Weatherchem*, 163 F.3d at 1333. The following policy considerations underlying § 201(b) were considered along with the surrounding circumstances: policy against removing inventions from the public domain which the public believes were freely available because of prolonged sales activity; policy favoring prompt and widespread disclosure of new inventions to the public; policy forcing the inventor to choose between seeking patent protection promptly following sales activity or risking competition from competitors without patent protection; and policy giving an inventor a reasonable amount of time following sales activity to decide whether a patent would be a worthwhile pursuit.

10. There is no requirement that the offer identify the limitations of the claim or that the buyer have recognized the significance of the claims or that the apparatus possessed the claimed characteristics at the time. *Scaltech*, 178 F.3d at 1383–84.

is primarily for *bona fide* experimental purposes to perfect the invention, rather than for commercial exploitation, the inventor may escape the statutory on-sale bar of § 102(b). *Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.,* 984 F.2d 1182, 1185 (Fed.Cir.1993). In *Paragon,* the record established that before the critical date, the plaintiff published prices lists and sales letters offering for sale the subsequently patented orthotic. The plaintiff on appeal challenged the district court's determination that the sales were not for experimental purposes. The plaintiff had relied on an affidavit from the inventor averring that he had considered the sales to be for experimentation, not for profit, so that the inventor could try to determine if the heel of the orthotic was sufficiently fused to the shell so as to be "unitary," as required by the claims. The inventor further stated that the sales were promoted to small volume or new customers in order to minimize negative effects if the devices were not satisfactory and, according to industry custom, to obtain feedback before engaging in large scale commercialization. *Id.* at 1186.

The Federal Circuit concluded that "the limited extent of the sales does not negate the bar. Even a single sale outside the grace period may be sufficient to invoke section 102(b)." *Paragon,* 984 F.2d at 1188. Looking at all the surrounding circumstances to determine whether there was a sale or an offer for sale,[11] the appellate court determined that the sales were primarily for a commercial purpose and discounted the inventor's affidavit of his experimentation intent as "no more than a conclusory legal opinion which rests on a

misunderstanding of the nature of activities which are legally permissible outside the grace period." *Id.* The Federal Circuit noted that it had previously held that "the expression by an inventor of his subjective intent to experiment, particularly after the institution of litigation, is generally of minimal value." *Id.* at 1186.

### E.I.L.'s JMOL Motion

There is no dispute that the critical date for the '776 patent was July 31, 1978, and therefore a sale or offer for sale of the claimed invention prior to that date may give rise to an on-sale bar and render the patent invalid. In its motion for judgment as a matter of law on the on-sale bar, E.I.L. argues that claim 24 of the '776 patent is invalid because it was offered for sale more than one year prior to the filing date of the '776 application and that no reasonable jury should have concluded that the subject matter of claim 24 was not "on sale" before July 21, 1978.[12] It further points to three primary factors for the Court to consider in determining whether the on-sale bar applies here: (1) the invention must be embodied in the offer for sale; (2) the device that was offered for sale had to have been functional at the time of the offer; and (3) the device must have been offered for sale for profit and not for experimentation. *J.A. LaPorte v. Norfolk Dredging Co.,* 787 F.2d 1577, 1580 (Fed.Cir.), *cert. denied,* 479 U.S. 884, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986).

E.I.L. first points to evidence, i.e., the testimony of Don Bendikson, an Altech distributor on the West Coast, and Ken Moskowitz, a free lance salesman for Altech, that the subject matter of Claim 24

11. The Federal Circuit looked as such facts as Paragon's informing its doctors and their patients that the orthotics were fully tested devices, the inventors's failure to retain control over the devices after sale and failure to keep records, the failure to obtain confidentiality agreements and the acceptance of payment. The court also pointed out that it had previously held "that the assertion of experimental sales, at minimum, requires that customers must be aware of the experimentation." 984 F.2d at 1186–87, *citing LaBounty Mfg., Inc. v.*

*United States Int'l Trade Comm'n,* 958 F.2d 1066, 1072 (Fed.Cir.1992); *In re Dybel,* 524 F.2d 1393, 1401 (Cust. & Pat.App.1975).

12. E.I.L. notes that the Court previously denied a similar motion and gave the issue to the jury, but explicitly stated that the motion would be reconsidered after the jury's decision if "reurged" by either party. TT, Vol. 8A at 1851.

was embodied in the controller device that they offered for sale. Bendikson testified that the solid state (electronic) controller he offered for sale included a single set point for a suction pressure, a transducer to sense the suction pressure, time delays for turning compressors on and off, and capability for use in multiple compressor systems that were parallel piped. Trial Transcript ("TT"), Vol. 4 at pp. 746–50. Moskowitz identified the same features in the controller that he offered for sale and testified that it operated in a FIFO operating logic. TT, Vol. 8 at pp. 1748–50, 1758–61.

Bendikson and Moskowitz also testified, with corroborating documentary evidence, that they offered the subject matter of claim 24 for sale prior to the critical date. Bendikson testified to a number of offers for sale around June 1978, without doubt before the critical date, including Lucky Stores and an Alpha Beta store. Bendikson, TT, Vol. 4 at pp. 746–53, 758. His testimony is corroborated by a letter to Richard Alsenz dated June 8, 1978, stating that Mike Mafi of Lucky Stores was "VERY INTERESTED" in the new SSPC controller.[13] DX–56; TT, Vol. 4 at 734–42. Moskowitz also testified about his sales activities. TT, Vol. 8 at pp. 1748–50 (describing the features of the invention he was selling during June/July 1978), 1758–61. Moskowitz's deposition testimony (read into the record at trial), corroborated by documentary evidence of his flight logs (DX–64) and a letter to Don Bendikson, and by the trial testimony of Charles Cuin, service and installation manager for Altech (TT, Vol. 5, at 889–90),[14] evidenced that there was a trip on June 24, 1978.[15] Bendikson and Moskowitz both testified that a price was available before the critical date. Bendikson, TT, Vol. 4 at 738–39; Moskowitz, TT Vol. 8 at pp. 1751–52. Defendants'

trial exhibit 57, a sales letter sent by Moskowitz to Bendikson, a new dealer, on July 31, 1978, states that the "new price" for the SSPC is $450 to dealers for quad systems; $700 list and $350 for dual unit; $535 list. TT, Vol. 8, at 1751–52. Moskowitz testified that previously a higher price had been in effect. Id. Bendikson's testimony corroborated Moskowitz's. Vol. 4. at pp. 764–65, 768–69. Cuin testified that there was an estimated, but not a final, price for the controller in June 1978. Vol. 5, at p. 873–74. E.I.L. points to a statement in *Evans Cooling Systems, Inc. v. General Motors Corp.*, 125 F.3d 1448, 1450–51 (Fed.Cir.1997), *cert. denied,* 522 U.S. 1115, 118 S.Ct. 1050, 140 L.Ed.2d 113 (1998), to argue that the fact that a price was not final, but only estimated, prior to the critical date does not defeat their motion for JMOL:

> "Likewise, neither the fact that the price was not firm nor that the color had not been chosen avoids the section 102(b) bar. Mr. Najarian was given an estimated price range and it is not uncommon for car buyers to change their minds about the desired color."

Moreover in *Evans Cooling,* the court further found that even if an independent dealership violated internal procedures by offering a '92 Corvette for sale prior to the model announcement date set by General Motors, it is still an offer for sale. *Id.* at 1451. Thus, by analogy, Bendikson and Moskowitz's testimony regarding their sales activity in June or July would still constitute an offer of sale. In sum, contends E.I.L., no reasonable jury could find that the subject matter of claim 24 of the '776 patent was not offered for sale prior to July 31, 1978.

Furthermore, E.I.L. insists, the evidence demonstrated that the controller offered for sale by Bendikson and Moskowitz

---

13. "SSPC" stands for "Solid State Pressure Control."

14. With the exception of one detail, that Cuin drove a car rather than a truck.

15. Cuin testified that Moskowitz took Cuin to install; not sell product. TT, Vol. 5 at 890. Cuin testified that he was not a salesman, but an installer and a service person, not involved in sales in any way. TT, Vol. 5 at 870.

was functional and operable for its intended purpose at the time of the offer for sale. Ernest Podraza, Energy Specialist Employee of Weingarten's, testified that before the critical date, the Alsenz controller with FIFO, installed at Weingarten's for comparative testing against others, had operated at Weingarten's for at least three one-week periods for a total of over 500 hours without a malfunction or problem. TT, Vol. 2 at 384–87; DX–59 (Podraza's report); DX–214. Cuin testified that the controller had been successfully tested in Altech facilities on a laboratory bench and was operational before being installed in the Weingarten's store. TT, Vol. 5 at 878–81. E.I.L. furthermore argues that Alsenz's testimony of experimentation is entitled to little or no weight under *Paragon*, 984 F.2d at 1186 (an inventor's testimony of his subjective intent to experiment is usually of minimal value). Moreover, while the Federal Circuit held that "assertion of experimental sales, *at a minimum*, requires that customers must be aware of the experimentation," E.I.L. emphasizes that there is no evidence that the offers for sale by Bendikson and Moskowitz included such a notice of experimental activity to potential customers.

Nor, urges E.I.L., is there any evidence that the offers for sale were for experimental purposes. On the contrary, both Bendikson and Moskowitz testified that the offers for sale were for profit. Bendikson, TT, Vol. 4, at pp. 738–41; Moskowitz, TT. Vol. 8 at pp. 1727–28, 1752–53.

Thus, in the light of the evidence and the three factors to be considered on the legal issue of the "on-sale" bar, E.I.L. maintains that no reasonable jury should have found that the subject matter of claim 24 was not "on sale" before the critical date of July 31, 1978.

### Plaintiffs' Response

In opposition, Plaintiffs insist that substantial evidence supports the verdict and it must stand. They maintain that the evidence shows that the new controller was not completed until after the critical date and was not operable at the time of the alleged offer for sale, that there was not a firm, definite offer to sell the invention prior to the critical date, and that substantial evidence was presented from which the jury could determine that any offer for sale was primarily for experimentation, not profit. They assert that "EIL relied on the shaky and uncertain testimony of Mr. Bendikson and Mr. Moskowitz to establish an alleged date of sale" and claim that the two men testified or made clear on several occasions that they were unsure of dates (TT, Vol. 4, at pp. 751–52,[16] 807–08,[17] Vol. 8 at 1750 [18]) and stated that their testimony was "likely" or "probable" (*id.*, Vol. 4 at 739,[19] 757,[20] 764–65,[21] 788,[22] 809–

---

16. The Court finds that Plaintiffs are attempting to cloud the testimony on this issue. A substantial number of years had passed since all these activities occurred. Although Bendikson could not identify a specific date for a sales call in April–July 1978, when asked "if there is any doubt in your mind ... that you offered the Altech controller that had all these features we've listed here today, that you offered that controller for sale prior to—Let's look at this letter—prior to June 8th, 1978 date of the letter you wrote to Mr. Alsenz about the Lucky Store," Bendikson responded, "I have no doubt that I was promoting that controller during that period." TT, Vol. 4, at 752.

17. This testimony relates to his first installation and first sale, not to an offer for sale.

18. Again the Court notes that Moskowitz testified that he could not "put his finger on" the "exact date" that he was selling a product with the features disclosed in Claim 24, but that "it would be in June/July 1978" as reflected in his pilot's log and his July 31, 1978 letter to Don Bendikson with the new pricing. Vol. 8 at 1750.

19. Plaintiffs are selecting narrow excerpts and ignoring the full context of the statements. In this instance, when asked whether the phone call or meeting with Mike Mafi was his first attempt to sell the Altech controller, Bendikson answered, "More than likely, not." He explained, "Because I was moving around pretty rapidly. I went to Alpha Beta and Hughes and Boys, and all the other stores, and was talking to all kinds of people about the control; rather excited. So it wouldn't

10 [23]). They insist E.I.L. is not entitled to any favorable inferences from such testimony and that ambiguous testimony does not satisfy the standard of clear and convincing evidence.[24] They also state that the testimony of Bendikson and Moskowitz "at best, simply showed that preparations were being made to market the invention once the invention was completed." [25] *Seal–Flex, Inc. v. Athletic Track and Court Constr.*, 98 F.3d 1318, 1322 (Fed.Cir. 1996) (It is "well recognized" that an inventor's development of new technology may overlap with market development); *Allied Colloids*, 64 F.3d at 1575 (contacting customers to test a product does not raise a § 102(b) "public use" bar even though a commercial purpose underlies virtually every customer contact); *Intel Corp. v. U.S. International Tr. Comm'n*, 946 F.2d 821, 830 (Fed.Cir.1991) (not a violation of the on-sale bar to make preparations for the sale of the claimed invention). Finally, without citing any specific examples, Plaintiffs insist that the testimony of EIL witnesses contradicted that of Podraza, Cuin and Alsenz and the documents.

Plaintiffs argue that the invention is not operable unless sufficiently developed and tested so that the inventor, Alsenz, knew the invention would work for its intended purpose and its intended environment. Such phrasing is not precisely accurate with respect to the cases they cite and the law under *Pfaff* and progeny for evaluating the date when an invention becomes patentable. To be more exact, the Court quotes one of Plaintiffs' authorities:

> A determination that an invention was on sale within the meaning of the statute requires that "the claimed invention asserted to be on sale was operable, the complete invention claimed was embodied in or obvious in view of the device offered for sale, and the sale or offer was primarily for profit rather than experimental purposes." ... [E]ven though the technical requirements of a reduction to practice have not been met,

have just been Lucky. There was other people that were more interested quicker with my sales effort than what Lucky was." He also stated clearly in response to a question, "I kept Altech informed always of my sales efforts." Vol. 4 at p. 739.

**20.** When asked when he first called on Alpha Beta about selling the controller, Bendikson replied, "It would probably have been back in April, May, June, somewhere in there," but added that there was "no doubt in my mind" that his sales calls were made before July 31, 1978. Vol. 4 at 757–79.

**21.** When asked, "Do you recall—when you spoke to Alpha Beta about this controller, do you recall if you spoke about a price with them," Bendikson responded, "More than likely, I talked about price." When Plaintiffs' counsel objected to the answer as nonresponsive and was sustained by the Court, to the same question Bendikson directly answered that he did recall taking about price with Alpha Beta but did not remember what the price was. Vol. 4 at 764–65.

**22.** When asked about Bendikson's receipt of the July 31, 1978 letter to Bendikson from Moskowitz, Bendikson agreed that he "probably" did not receive the letter until after that date. Since the letter was used to show Moskowitz's sales efforts prior to the critical date, the fact that Bendikson probably received it after the critical date is not material.

**23.** The transcript here reads as follows:

> Q. [by Plaintiff's counsel] Between the time—let's say between the time that you first heard a controller would be coming but would have to be tested in May 1978 until the test in the Alpha Beta store in November of 1978, basically, you did not receive a whole lot of information about what was going on? You just waited for the information? True?
> A. More than likely, probably phone conversations and that sort of thing. They might not have had literature ready at that time.

While Plaintiff's counsel continued to press the fact that there were no brochures available at the time, that does not negate the testimony that at least one offer of sale was made.

**24.** As noted, the Court finds that Plaintiffs have attempt to obfuscate and create ambiguity in the testimony where there was none.

**25.** The testimony of Bendikson and Moskowitz clearly does not support Plaintiff's characterization of it.

a sale or a definite offer to sell a substantially completed invention, with reason to expect that it would work for its intended purpose upon completion, suffices to generate a statutory bar [citations omitted].

*Robotic Vision Systems, Inc. v. View Engineering, Inc.,* 112 F.3d 1163 (Fed.Cir. 1997), *citing Micro Chem., Inc. v. Great Plains Chem. Co.,* 103 F.3d 1538, 1545 (Fed.Cir.1997) [, *cert. denied,* 521 U.S. 1122, 117 S.Ct. 2516, 138 L.Ed.2d 1018 (1997) ]. Since the invention need not be reduced to practice, testing need not be complete, and the inventor's intentions are of little import. In *Pfaff,* 119 S.Ct. at 309, the Supreme Court quoted from *The Telephone Cases,* 126 U.S. 1, 535–36, 8 S.Ct. 778, 31 L.Ed. 863 (1888),

> "The law does not require that a discoverer or inventor, in order to get a patent for a process, must have succeeded in bringing his art to the highest degree of perfection. It is enough if he describes his method with sufficient clearness and precision to enable those skilled in the matter to understand what the process is, and if he points out some practicable way of putting it into operation."

Nevertheless Plaintiffs contend that from the substantial evidence admitted at trial, a jury could reasonably have concluded that the invention was not operable until after the critical date and that E.I.L. failed to present clear and convincing evidence that it was operable before that date. Specifically they point to the testing at the Weingarten food stores in Houston during the summer of 1978. The preliminary tests of the new Altech controller began the week ending June 20, 1978 and continued past the critical date into August. PX–278 (Ex. J) at A 018899; TT, Vol. 2 at 332–344 (Podraza testimony). Alsenz was not paid for the test units (TT, Vol. 2 at 331, 345–46, Vol. 6 at 1097), charts and reports evaluating the controller were generated (TT, Vol. 2 at 336–44, Vol. 6 at 1093–94, PX–278 (Ex. J)), Alsenz participated in the tests (TT, Vol. 2 at 331–

32, 704–05, 1092), and the controller was sealed in black epoxy to prevent anyone from seeing or tampering with the secret controller (TT, Vol. 2 at 327–29, Vol. 4 at 704–05). They maintain that Alsenz used Weingarten's as his laboratory because he did not have equipment of his own that could simulate a supermarket environment. (TT, Vol. 2 at 340, Vol. 5 at 879–81).

Although E.I.L. contends that the invention was operable because it worked during test periods at Weingarten and because some Altech units were tested on the bench without being connected to compressors, and that Alsenz knew before or during the Weingarten testing that his controller would work for its intended purpose, Plaintiffs argue that the record does not support these assertions. Just because a device works part of the time, Plaintiffs insist, does not mean the device is operable or that testing is complete. *Seal–Flex,* 98 F.3d at 1324 (§ 102(b) bar does not accrue until evaluation period is complete); *Manville Sales Corp. v. Paramount Systems, Inc.,* 917 F.2d 544, 551 (Fed.Cir.1990). They emphasize that no witness testified that testing was complete prior to the critical date or that Alsenz knew or should have known that his invention would work by the critical date. Instead, Plaintiffs assert, substantial evidence showed that Alsenz had no technical justification for believing his invention was "operable" until after the testing was complete.

Furthermore, because two other controllers were being tested with the Altech controller, and each controller would operated for a one week period, Plaintiffs emphasize that the Altech controller did not run continuously from June through August. PX–278 (Ex. J) at A 018890–91; TT, Vol. 2 at 335–37. Problems included difficulty in Alsenz's supplying a unit that could be tested and that both Altech and Hussman controllers were connected accidentally to the compressors causing timer malfunctions. Once the mistake was discovered and corrected, the Altech control-

ler was run for three weeks from mid July through August 1 under various test conditions. Podraza prepared an analysis on August 4, 1978, summarizing the testing. Only then was the controller sufficiently tested for its intended environment, Plaintiffs assert. Further testing actually continued at Weingarten through at least mid August.

Maintaining that the length of testing was reasonable, Plaintiffs also argue that Alsenz showed test charts to the jury indicating that the test controller malfunctioned during its initial testing and during subsequent testing in August. TT, Vol. 6 at 1087–91; DX–59 (Ex. R); PX–339 (Ex. K). Two examples are the strip chart marked EP000430 (DX–59 (Ex. R)), reflecting all the compressors improperly changing state together, TT, Vol. 5 at 1088–89; and PX–339 (Ex. K), DX–246 (Ex. V), reflecting that the controller was not selecting compressors in the correct FIFO order because the counters were not operating properly, TT, Vol. 5 at 1090–95, 1098. Only after the critical date, in August 1978, did Alsenz remedy the problem of the controller malfunctioning by turning on and off randomly.

Cuin also testified that the controller did not always work properly during the test and that the controller was not complete nor ready to be sold by the critical date. TT, Vol. 5 at 858–59, 860–64. Bendikson testified that he received the first new Altech controller on September 11, 1978. TT, Vol. 4 at 791–92; DX–62 (Ex. S). Moreover, he sent the first unit back because it performed erratically. DX–65 (Ex. T) at E006530; PX–441 (Ex. O); TT, Vol. 4 at 792–93, 801–02.

One document relied on by E.I.L., DX–56 (Ex. P), reflects that the invention was not operable, i.e., not "ready to go," at the time of Bendikson's June 8, 1978 letter allegedly supporting an offer of sale. TT, Vol. 4 at 784–85 (compressor controller not ready to go on June 8, 1978). Bendikson also admitted that the new controller was not demonstrated to be successful as late

as August 8, 1978. TT, Vol. 4 at 791, 813 (Altech developing a controller through November/December of that year).

Finally, Plaintiffs distinguish the facts here from those in *Pfaff* by noting that in *Pfaff* there were drawings and descriptions of the invention sufficiently specific to enable the practice of the invention, even though it had not yet been reduced to practice.

Observing that courts are wary of uncorroborated inventor testimony that a sale was for experimentation, not for profit, Plaintiffs argue that Alsenz's testimony is relevant and should be considered as evidence at least in determining at what stage the invention worked for its intended purpose. *Seal–Flex,* 98 F.3d at 1323 (summary judgment not proper where inventor testified that he did not know if invention would work until it was tested in intended environment without failing); *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,* 806 F.2d 1565, 1573 (Fed.Cir.1986) (jury had the right to find the investor's testimony established that the invention was still in the test phase). They distinguish the facts here from those in *Paragon Podiatry,* 984 F.2d at 1185–86, by noting that in *Paragon Podiatry,* the court discounted the inventor's testimony because approximately 300 devices embodying the invention had been sold prior to the critical date, the inventor placed no control over the use of the devices sold, the sales documents failed to indicate that the sales were for testing, and the inventor tried to raise a genuine issue of material fact on summary judgment by averring a subjective intent to experiment. In contrast, argue Plaintiffs, here there was no sale before the critical date, Alsenz received no money from the claimed invention until months later, and Alsenz's testimony is supported by the record. They maintain that the jury reasonably concluded that Altech did not know that the claimed invention would work for its intended purpose until after the critical date, TT, Vol. 5 at 1094–95, 1098, and

therefore E.I.L.'s motion for JMOL should be denied.

Plaintiffs argue that making preparations for the sale of a claimed invention does not violate the on-sale bar; an actual sale or offer to sell must be proved. *Intel,* 946 F.2d at 830. It is not enough that an offer or sale was likely or that such an inference could be made. *Id.* at 829–30. Neither of the letters relied upon by E.I.L. is an unconditional offer for sale, but only at most preparations for selling once the product development was completed, and therefore the jury reasonably found that E.I.L. did not satisfy its burden of producing clear and convincing evidence of a definite offer for commercial sale. The June 8, 1978 letter from Bendikson to Alsenz merely shows that Mike Mafi was interested in scheduling a meeting once Alsenz had "the compressor controller ready to go." DX–56 (E.P.). Bendikson conceded that he had no documents or letters to show that he was selling the control prior to the critical date. TT, Vol. 4 at 752. He further admitted that the controller was not ready to go on June 8, 1978. TT, Vol. 4 at 784–85. On cross-examination Bendikson responded that all he told his companies until November or December was that Altech was in the process of developing a new controller. TT, Vol. 4, 813–14. He also stated that he did not receive an operational controller until November 1978 and did not make his first sale until December 1978. TT, Vol. 4 at 808–09.[26]

As for Moskowitz's July 31, 1978 letter to Bendikson (DX–57), Plaintiffs notes that Moskowitz conceded that it would not have been received by Bendikson until after that critical date (TT, Vol. 4 at 788), and therefore should be disregarded even if it contained an offer for sale. Plaintiffs nevertheless insist the letter does not evidence an offer for sale of Altech's new controller, but merely proposes a new price for the SSPC controller. DX–57 (Ex. Q). A communication between two members of Altech's sales force would not constitute an offer for sale even if the letter had been dated prior to the critical date. *Intel,* 946 F.2d at 830 (distribution of samples to sales force is not a violation of on-sale bar).[27] They maintain that a reasonable inference is that Altech was trying to decide on a sales price for the controller so that it could begin marketing it once testing was completed and the product was ready to be sold. TT, Vol. 6 at pp. 1096–97 (Alsenz's testimony that prices were discussed in preparation for ultimately selling the units).

In sum, Plaintiffs' argue the invention was not reduced to practice, no samples were given to Altech salesmen and distributors, the only controllers available were those personally installed at Weingarten by Alsenz for testing, the evidence at most reflects Altech's making preparations to set up sales meetings, arrive at a price, and market the invention once testing was completed, and E.I.L. could not produce a single customer to testify that it had received a sales offer or purchased a controller from Altech prior to the critical date. Thus the jury verdict was reasonable.

Finally, insist Plaintiffs, E.I.L. failed to show by clear and convincing evidence that any sale or offer before the critical date was done primarily for profit, and not for experimentation. The jury did not find credible the testimony of Bendikson and Moskowitz, on which E.I.L. relied. Bendikson's testimony does not say that he offered the controller for sale, nor indicate whether any alleged offer for sale was for profit or experimentation. TT, Vol. 4 at 740–41. Bendikson sent the first unit he received in September to Alpha Beta, where it was tested and found not to operate properly. TT, Vol. 4 at 791–93. He did not make his first sale of the new

---

**26.** The Court observes that Plaintiffs persistently blur the clear distinctions between a sale and an offer of sale, either of which can trigger the on-sale bar.

**27.** The Court notes there is no issue of distribution of samples here.

controller until December 1978. TT, Vol. 4 at 819–20. Similarly, Moskowitz did not indicate that a sale was made that was primarily for profit, not experimentation. Moskowitz also testified that Bendikson made his sale "at some point after" Moskowitz's July 31, 1978 letter. TT, Vol. 8 at 1728.

### E.I.L.'s Reply

In reply, E.I.L. insists that the "evidence overwhelmingly shows that a reasonable jury could only have concluded that the subject matter of claim 24 of the '776 patent was 'on sale' prior to the critical date of July 31, 1978." Reply at 1. Because E.I.L. bears the burden of proof on the legal issue of "on sale," JMOL should be granted in favor of E.I.L. only if it "has established [its] case by evidence that the jury would not be at liberty to disbelieve" and "the only reasonable conclusion is in [E.I.L.'s] favor." *Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1065 (Fed.Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 178, 142 L.Ed.2d 145 (1998). There is no substantial evidence in the record to support the jury's conclusion that the '776 invention was not on sale prior to the critical date, insists E.I.L.

Plaintiffs have argued that before the critical date, there is no substantial evidence to support the jury's conclusions that the claimed invention was not operable, there was no definite offer to sell or a sale, and there was no offer to sell primarily for profit rather than experimentation. E.I.L. demonstrates Plaintiffs are wrong on each count.

Under the two-prong inquiry of *Pfaff* (see indented quotation on page 7 of this memorandum and order), as agreed by Plaintiffs in their Opposition at 6, the experimental use doctrine applies only to the offer for sales factor, not to the operability/"ready for patenting" criterion. Therefore the doctrine is not relevant to a determination of whether the new controller was operable ("ready for patenting") prior to the critical date.[28] Altech has erroneously relied solely on the experimental use doctrine to argue that there is substantial evidence that the new controller was not operable prior to July 31, 1978, with each of its subheadings of its Opposition pointing to continuing testing of the claimed invention of the '776 patent after the critical date. Specifically each subheading of Plaintiffs' response addresses an aspect relevant to whether a use qualifies as an experimental use; the fourth subheading under the operability factor focuses on Alsenz's testimony that he intended the uses of the new controller at Weingarten's to be "experimental." The experimental use doctrine is not relevant to and cannot provide substantial evidence for the determination of whether the new controller was operable prior to the critical date.

In contrast, E.I.L. has properly demonstrated that the controller was operable prior to the critical date. As in *Nobelpharma,* Plaintiffs' own witness, Charles Cuin, has testified that the controller in Weingarten's store #106 was operable and that each of the features of claim 24 of the '776 patent was present in the Altech

---

28. This Court agrees. The issue of whether an invention was on sale encompasses the experimental use exception and forms a single issue. "Under long standing judicial interpretation, a product embodying the patented invention, which is sold or offered for sale more than a year before the application's filing date, may escape the statutory bar where such sale was primarily for a bona fide experimental purpose to perfect the invention, rather than for commercial exploitation." *Paragon Podiatry,* 984 F.2d at 1185 & n. 3. The experimental use exception applies only if commercial exploitation is "merely incidental to the primary purpose of experimentation to perfect the invention." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 839 (Fed.Cir.1984). There is no evidence that the offers for sale testified to by Bendikson and Moskowitz were experimental purposes; rather the evidence regarding pricing indicated that profit was the primary motive in marketing the invention to stores like Lucky and Alpha. The patent owner has the burden of presenting evidence of experimental purpose. *Id.*

controller that operated in Weingarten's Store # 106 prior to the critical date. Ex. C to E.I.L.'s Reply, TT, Vol. 5 at 885–88. Alsenz's testimony confirmed that the subject matter of Claim 24 was embodied in the device that was being "tested," actually "evaluated," maintains E.I.L., at Weingarten store # 106. TT, Vol. 6A, at 1212–13. Furthermore, Bendikson and Moskowitz each testified that the controller he was offering for sale prior to July 31, 1978 included the subject matter of claim 24. TT, Vol. 4 at 746–51, Vol. 8 at 1748–50, 1758–61. Therefore, since the controller being operated at Weingarten's store # 106 had all the features of claim 24, E.I.L. contends that it was obviously "ready for patenting" under *Pfaff.* Thus the testimony of these witnesses, including Altech's Alsenz and Cuin, and the absence of evidence produced by Altech, there is no substantial evidence on which a reasonable jury could have concluded the E.I.L. did not prove that the claimed invention was operable prior to July 31, 1978.

E.I.L. objects to Altech's claim that it asked the jury to infer from the two letters of Bendikson and Moskowitz that an offer of sale was made. One of the letters was used to corroborate each man's testimony that each personally made offers to sell the claimed subject matter prior to the critical date. Bendikson, Ex. F to Reply, TT at pp. 746–53; Ex. G to Reply, TT at pp. 1748–50, 1758–61. Altech's diversionary excerpted remarks do not change the fact that at least one sufficiently definite offer to sell was made prior to the critical dates, as testified to by both Bendikson and Moskowitz. "[M]erely offering to sell a product by way of an advertisement or invoice may be evidence of a definite offer for sale or a sale of a claimed invention even though *no* details are disclosed. That the product is in fact the claimed invention may be established by any relevant evidence, such as memoranda, drawings, *correspondence, and testimony of witnesses.*" *RCA Corp. v. Data General Corp.,* 887 F.2d 1056, 1060 (Fed.Cir.1989) (emphasis added). Bendikson and Moskowitz's testi-

monial evidence that each intended to offer the invention is overwhelming evidence that at least one offer to sell was actually made. Moskowitz's letter of July 31, 1978 fully corroborates the testimony of Bendikson, Cuin, and himself, establishing that a price was available prior to the critical date and therefore at least one definite offer to sell was made before July 31, 1978. *TRW Financial Systems, Inc. v. Unisys Corp.,* 835 F.Supp. 994 (E.D.Mich.1993) ("Merely quoting a price to a potential customer when the invention is sufficiently developed can render a patent invalid . . . ."), *citing Sonoscan, Inc. v. Sonotek, Inc.,* 936 F.2d 1261 (Fed.Cir.1991).

In contrast, urges E.I.L., Altech presents no substantial evidence to deny the compelling testimony of Bendikson and Moskowitz or the corroborating testimony of Cuin. No reasonable jury could have determined that a definite offer to sell the claimed invention was not made.

Nor does substantial evidence support the jury's conclusion that the claimed invention was not offered for sale or sold primarily for profit rather than experimentation. Although Plaintiffs argue that the use of the invention at Weingarten's was for experimental purposes, that if a controller failed, it was being used for experimental purposes, and that a decreasing price on the controller meant that the sales force was preparing for future offers for sale rather than attempting to increase the current salability of the controllers, E.I.L. maintains that these three arguments do not constitute substantial evidence that controverts the fact that the controllers were offered for sale primarily for profit prior to the critical date. Regarding the first, the issue is not whether the controllers at Weingarten's were being offered for profit, but whether the offers by Bendikson and Moskowitz were for profit.

The second argument is specious because continuing problems do not mean necessarily that the use of an invention is experimental or it is not ready for patent-

ing. The problems Plaintiffs assert were not related to the features essential to the claimed subject matter. E.I.L. also maintains that Bendikson installed a sample controller in an Alpha Beta store in the expectation that the store would be satisfied and buy additional controllers. E.I.L. points out that Altech cited testimony by Bendikson indicating that the first unit sold, an "erratic" controller in an Alpha Beta California store, was replaced in November 1978 under warranty rather than under some sort of experimentation or test agreement. TT, Vol. 4 at pp. 800–02. Bendikson, moreover, agreed with Plaintiff's counsel that "after that it worked to their satisfaction and so they began to buy them from you for their other stores." *Id.* at 800.

Insisting that Alsenz's various assertions, that the offers to sell were for experimental purposes, do not constitute substantial evidence, E.I.L. reiterates the holding of *Paragon Podiatry*, 984 F.2d at 1186 that "[t]he expression by an inventor of his subjective intent to experiment, particularly after institution of litigation, is generally of minimal value" and that "the assertion of experimental sales, *at a minimum,* requires that customers be made aware of the experimentation." It emphasizes that Plaintiffs have not presented any evidence that any customers were made aware of any intent to experiment.

Last of all, Plaintiffs' argument that decreasing the price of the controller meant that the sales force was preparing for future offers for sale rather than constituted an effort to increase the current salability of the controllers is also meritless, E.I.L. contends. Portions of the trial transcript demonstrate that this argument is false. Moskowitz testified that the decrease in prices "was to make the product more salable," thereby also reflecting the profit motive in their marketing of the invention. TT, Vol. 8 at 1727–28. Moreover, he stated the following:

A. You start out with a product at a higher price and then lower the price to start moving the product, to indicate that the price is coming down, that there's something to stimulate movement and growth.

Q. The old price, Mr. Moskowitz, how long were you offering the SSPC pressure controller for sale using the old price—or old prices, I guess I should say—if you remember?

A. I don't remember. Looking here at the log would have been sometime in June to July, the later part of July. *Id.* at p. 1752. E.I.L. argues that this testimony, cited by Plaintiffs, exposes the inaccuracy of Altech's price decrease argument and simultaneously shows that there were offers to sell in June and July prior to the critical date and that the decrease in price was intended to stimulate sales growth by making the offers to sell more attractive to customers.

## Court's Ruling

This Court finds that E.I.L. has met its burden of proof of demonstrating that there is no substantial evidence in the record to support the jury's finding that there was no offer of sale prior to the critical date. E.I.L. has presented uncontroverted and corroborated evidence that Bendikson and Moskowitz were offering the invention of Claim 24 of the '776 patent for sale for profit. The fact that the two men, along with Plaintiff's own witness, Charles Cuin, corroborated each other's testimony and the written letters evidencing their commercial efforts, undermines Plaintiffs' efforts, aside from the strained mischaracterizations of their testimony as reflected in the Court's footnotes, to argue all three lacked credibility.

After reviewing the record and the applicable law, the Court concludes that E.I.L.'s JMOL motion should be granted. This Court concurs with E.I.L. that E.I.L. has met its burden of demonstrating with overwhelming evidence in the corroborating testimony of Bendikson, Moskowitz and Cuin that the subject matter disclosed in Claim 24 of the '776 patent was embod-

ied in the controller offered for sale by Bendikson, including features of equalizing wear time, single set point for a suction pressure, a transducer to sense the suction pressure, and time delays for turning on and off compressors, and that the device was to be used in multiple compressor systems that were in "tandem," i.e., parallel piped, prior to the critical date and that Claim 24 is therefore invalid. The Court concludes that no reasonable jury could find that the device offered for sale was not embodied in the subject matter of claim 24.

The Court further determines that in light of Bendikson and Moskowitz's corroborative testimony about offers for sale and price decreases, supported also by that of Cuin, with documentary support in the form of letters, no reasonable jury could find that Bendikson and Moskowitz did not offer the invention for sale prior to the critical date.

Moreover, the Court concludes the testimony of Plaintiffs' witnesses, Podraza and Cuin, demonstrated that the controller was functional and operable for its intended purpose at the time of the offer for sale. No reasonable jury could conclude the opposite.

Finally, there is overwhelming evidence that Moskowitz and Bendikson's offers of the controller for sale were for profit and not for experimentation.

Accordingly, the Court

ORDERS that E.I.L.'s motion for JMOL is GRANTED and DECLARES that Claim 24 of the '776 patent is invalid under 35 U.S.C. § 102(b).