**FERAG AG, Plaintiff–Appellee,**

v.

**QUIPP INCORPORATED, Defendant–Appellant.**

No. 94–1048.

United States Court of Appeals, Federal Circuit.

Jan. 24, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied March 2, 1995.

Richard G. Lione, Willian Brinks Hofer Gibson & Lione, Chicago, IL, argued, for plaintiff-appellee. With him on the brief were John K. Lucas and Gustavo Siller, Jr.

Joel M. Reed, Howrey & Simon, Washington, DC, argued, for defendant-appellant. With him on the brief were Richard H. Kjeldgaard, Celine T. Callahan and Jennifer L. Alvey. Also on the brief were L. Lawton Rogers, III and Joseph M. Killeen, Rogers & Killeen, Alexandria, VA.

Before MAYER, MICHEL, and LOURIE, Circuit Judges.

MAYER, Circuit Judge.

Quipp Inc. appeals the judgment of the United States District Court for the Southern District of Florida, *Ferag AG v. Quipp Inc.*, No. 90–CV–712 (S.D.Fla. Sept. 15, 1993), holding United States Patent No. 4,381,056, which has been reexamined, not invalid, enforceable, and infringed. We reverse.

## Background

Ferag AG (Ferag), a Swiss corporation, is the owner of U.S. Patent No. 4,381,056 (the Ferag patent or the patent), entitled "Conveyor Apparatus, Especially for Printed Products." Ferag manufactures mailroom equipment for the publishing industry and sells that equipment in the United States through Ferag, Inc., a Pennsylvania corporation partially owned by Ferag. At issue are reexamined claims 2, 10, 13–19, and 21 of the Ferag patent.*

Ferag's patent issued on April 26, 1983, from an application filed on January 15, 1981. The patent protects a conveyor apparatus. As claimed, a traction element, or chain,

---

* Claim 10, depending from claims 9, 8, and 1 (all cancelled during reexamination), is representative. Cancelled claim 1 reads:

1. An article conveyor apparatus, especially for printed products, comprising:
 a revolvingly driven traction element;
 a plurality of gripper clamps anchored in spaced relationship and supported by said revolvingly driven traction element;
 each of said gripper clamps having a movable clamp portion and a further clamp portion coacting therewith;
 a stationary control device provided for said gripper clamps;
 actuation means coacting with the stationary control device for bringing the movable clamp portion into a closed position;
 a releasable locking device for fixedly retaining the movable clamp portion in such closed position;
 said locking device comprising a latching device having a defined latching position;
 said latching device having a latchable element;
 said actuation means being coupled with the latchable element of the latching device; and
 a spring element which is tensioned when the related gripper clamp is closed and which is operatively connected with the actuation means and with the movable clamp portion of such gripper clamp.

Cancelled claim 8 reads:

8. The conveyor apparatus as defined in claim 1, wherein:
 said actuation means comprises a rotatably mounted shaft and an actuation element;
 said latchable element of said latching device being arranged upon said rotatably mounted shaft; and
 said rotatably mounted shaft being rigidly connected for rotation with said actuation element.

Cancelled claim 9, in turn, reads:

9. The conveyor apparatus as defined in claim 8, wherein:
 said spring element is connected with said shaft and said movable clamp portion and is tensioned upon closing of the gripper clamp.

Finally, claim 10 reads:

10. The conveyor apparatus as defined in claim 9, wherein:
 said spring element comprises a bending spring which, after bringing together the clamp portions, is tensioned in the latching position during further rotation of the shaft.

carries a number of specialized gripper clamps along a predetermined track. These clamps transport items, primarily newspapers and magazines, by gripping them between a stationary tongue and a movable tongue.

The claims at issue cover a conveyor apparatus, but aside from a brief reference to a traction element they focus exclusively on the details of the gripper clamps. It is the particular design of these clamps that distinguishes the patented invention from the prior art. Ferag concedes that the claimed clamps are embodied in Ferag's Model EP–100 clamps, incorporated in the Ferag EP–I/EP–II conveyor apparatus. Ferag had successfully tested the EP–100 gripper clamp by September of 1979.

Prior to March 31, 1979, Ferag owned all of the outstanding 100,000 shares of Ferag, Inc. stock. Then Ferag sold 100,000 additional shares of stock to Robert Smallacombe, and Smallacombe became chief executive officer and president of Ferag, Inc., and a member of Ferag, Inc.'s board of directors. Ferag and Smallacombe agreed to the creation of two voting trusts, whereby both Ferag and Smallacombe appointed independent voting trustees for 1,000 shares of Ferag, Inc. stock. Ferag appointed Susanne Reist, daughter of Walter Reist, Ferag's principal owner as a trustee; Smallacombe appointed his wife, Theresa Smallacombe. Ferag and Smallacombe could each vote a 49.5% interest in Ferag, Inc. Smallacombe's stock was subject to a buy back provision that allowed Ferag to reclaim the shares on March 31, 1987 if Ferag, Inc. had not eliminated its existing debt by that time.

An operations agreement between Ferag and Smallacombe granted Smallacombe management authority over the operations of Ferag, Inc. This authority was limited by an agreement that Ferag, Inc. was to use its best efforts to sell, manufacture, and service Ferag products, and by a provision requiring the mutual consent of Ferag and Smallacombe for certain management decisions. Ferag also retained the right to veto personnel decisions on some management positions. Ferag agreed to make its research and development available to Ferag, Inc., and Ferag, Inc. agreed to maintain Ferag's confidentiality.

Early in 1979, Ferag entered into discussions with the Bergen Evening Record (Bergen), a New Jersey newspaper publisher, about installation of Ferag equipment. In March of that year, Ferag, Bergen, and Ferag, Inc. entered into a three-way "Partnership Agreement" that provided for the installation of two Ferag inserting systems at Bergen's Hackensack facility. Each system was to be composed of an inserting drum, ancillary equipment, and conveyors to and from the inserting system. The agreement listed rough price estimates for each element of the system, and provided a schedule for Bergen's payments. The agreement did not provide specific operational details about the systems, but it did spell out general performance criteria, including the approximate conditions (in terms of number of papers per hour and pages per paper) under which the parties anticipated that the systems could operate. Finally, the parties noted "the experimental nature of the undertaking", and, in a handwritten addendum, recognized the confidential price concessions granted by Ferag "for the purpose of providing a 'showplace' in the United States."

On June 13, 1979, Ferag, Inc. and Bergen entered into an "Equipment Sales Agreement" that incorporates the March partnership agreement by reference. Ferag contends that the conveyor system offered in these agreements did not embody the claimed invention. Indeed, Ferag says that it did not even begin work on the EP–I/EP–II system until July of 1979, so that the sales activity of March and June could not have involved a product embodying the claimed invention.

On November 23, 1979, Ferag sent Ferag, Inc. a document confirming a Ferag, Inc. order (apparently dated July 6, 1979) of an inserting system destined for Bergen. Among other equipment, the order confirmation clearly specifies end product "EP–1" and "EP–2" conveyors, conceded by Ferag to include the EP–100 gripper clamps embodying the patent claims. The November 23 document sets out a provisional price for the whole system and delivery dates for many of

the system's components. Ferag apparently furnished no specific price or delivery date for the EP–I/EP–II system until January 24, 1980, when a subsequent order confirmation quoted prices and provided for a March 17, 1980 delivery date.

Quipp Inc. is a Florida corporation that, like Ferag, manufactures and sells a conveyor apparatus for printed products—the Quipp–Gripp Conveyor. Ferag filed this suit against Quipp on March 15, 1990, asserting that the Quipp–Gripp infringes the Ferag patent. In defense, Quipp argued that its product did not infringe the patent. It also alleged that the patent was invalid because Ferag had sold or offered for sale a product embodying the invention more than one year before the January 15, 1981, filing date, and that the patent was unenforceable because of Ferag's inequitable conduct during prosecution. On September 15, 1993, following a trial to the bench, the United States District Court for the Southern District of Florida found that Ferag had proved infringement by a preponderance of the evidence and concluded that Quipp had failed to carry its burden of showing invalidity and unenforceability by clear and convincing evidence. Quipp now appeals.

### Discussion

Quipp challenges the district court's interpretation of the claims, its analysis of the scope and content of the prior art, and its application of the on sale bar. Because we conclude that the court misapplied the on sale bar, and that the patent was invalid under that bar, we do not reach the other grounds for appeal.

 An inventor loses his right to a patent if he has placed his invention "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b) (1988). To invalidate a patent under the on sale bar, the party asserting the bar must demonstrate by clear and convincing evidence "that there was a definite sale or offer to sell more than one year before the application for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the claimed

invention or would have rendered the claimed invention obvious by its addition to the prior art." *UMC Elec. Co. v. United States,* 816 F.2d 647, 656, 2 USPQ2d 1465, 1472 (Fed.Cir.1987). The ultimate determination that a product was placed on sale under section 102(b) is a question of law, based on underlying facts. *KeyStone Retaining Wall Sys. Inc. v. Westrock, Inc.,* 997 F.2d 1444, 1451, 27 USPQ2d 1297, 1303 (Fed. Cir.1993). We review the ultimate determination *de novo,* but any subsidiary fact findings must be reviewed, in this case, for clear error.

 While a wide variety of factors may influence the on sale determination, no single one controls the application of section 102(b), for the ultimate conclusion depends on the totality of the circumstances. *Envirotech Corp. v. Westech Eng'g Inc.,* 904 F.2d 1571, 1574, 15 USPQ2d 1230, 1232 (Fed.Cir.1990). The underlying policies are what drives the section 102(b) analysis. *See King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 860, 226 USPQ 402, 407 (Fed.Cir.1985). Foremost among these is the policy of preventing inventors from exploiting the commercial value of their inventions while deferring the beginning of the statutory term. *See Envirotech,* 904 F.2d at 1574, 15 USPQ2d at 1232 (explaining policies underlying the bar). To this end, the inventor is strictly held to the requirement that he file his patent application within one year of any attempt to commercialize the invention. The demands of this policy must be weighed with the sometimes inconsistent goals of encouraging prompt and widespread disclosure of inventions to the public, discouraging the removal of inventions from the public domain when the public has come to rely on their ready availability, and giving inventors a reasonable period to discern the potential value of an invention. *Id.*

Quipp's first on sale argument centers on the transaction between Ferag and Ferag, Inc. reflected in the November 1979 order confirmation. The district court declined to invalidate the patent based on this transaction because "Ferag, Inc. was not a separate entity from Ferag AG." *Ferag,* slip op. at 28. Quipp says that in November of 1979

Ferag, Inc. was distinct from Ferag, and that the transaction between them thus is a bar to Ferag's patent. We agree.

A section 102(b) sale or offer must involve separate entities. *In re Caveney*, 761 F.2d 671, 676, 226 USPQ 1, 4 (Fed.Cir.1985). Where, as in this case, the parties to an alleged sale are related, it is more difficult to determine whether the inventor is attempting to commercialize his invention; accordingly, in such cases whether there is a statutory bar depends on whether the seller so controls the purchaser that the invention remains out of the public's hands. *See id.*

The district court concluded that Ferag retained sufficient control over Ferag, Inc. to avoid the statutory bar, based on "the proportion of outstanding shares held by the various parties; Ferag AG's ability to control critical materials and products; and the terms of the Operator's [sic] and Shareholder's agreements to which Mr. Smallacombe was a party." *Ferag*, slip op. at 28. We are convinced to the contrary that this evidence establishes that the two companies were separate and that the transaction reflected in the November order confirmation invokes the on sale bar.

Ferag and Ferag, Inc. were not controlled by the same person or group. The outstanding shares of Ferag, Inc. were evenly split between Smallacombe and Ferag's owners. This suggests *shared* control of Ferag, Inc., not control by Ferag or Ferag's owners. The terms of the agreements between Ferag and Smallacombe also reflect shared control. Ferag gave Smallacombe "complete management authority over the operations of [Ferag, Inc.]." This authority was constrained only by a mutual consent clause mandating agreement between Smallacombe and Ferag for certain corporate decisions and by the clause subjecting Smallacombe's authority to hire and fire employees to Ferag approval for certain management positions. A requirement of mutual consent in a few limited

circumstances, not implicated here, cannot change "complete management authority" to control by Ferag.

Ferag makes much of the clause requiring Ferag, Inc. to use its best efforts to sell and service Ferag products and not to sell competing products. Ferag also cites Ferag, Inc.'s obligation to protect the confidentiality of Ferag's research and development information. But these provisions, like Ferag's "ability to control critical materials and products" on which the district court relied, prove only that Ferag, Inc. was an exclusive distributor of Ferag products.

Ferag shared control over Ferag, Inc. with Smallacombe as to certain decisions, but Smallacombe's authority to run the company was otherwise essentially unfettered. Indeed, that autonomy is why Ferag brought in Smallacombe to run Ferag, Inc. in the first place, and why Smallacombe agreed to take the job. Because Ferag could not control Ferag, Inc.'s marketing of the invention, the two companies were separate entities for section 102(b) purposes and the transaction between them gives rise to a statutory bar.

The sale of a Ferag system to Bergen, which was the reason for the Ferag, Inc. purchase order, independently supports the conclusion that Ferag had placed the invention on sale before the critical date. The district court held that there was no on sale bar arising from this sale because Quipp had not proved that the product sold to Bergen embodied the patented invention. The court reached this conclusion because of its belief that for the on sale bar to apply, "[t]he patent owner must have had an intent to sell the invention prior to the bar date and that intent must be communicated to the public for the purposes of eliciting a sale prior to the bar date." *Ferag*, slip op. at 24. This is the wrong legal standard.**

As we said above, the overriding focus of section 102(b) is preventing inventors from reaping the benefits of the patent

---

** The district court declined to credit testimony by several of Quipp's witnesses en route to its determination that Quipp did not carry its burden of proving invalidity. The court also dismissed Quipp's documentary evidence as inconclusive. On this latter ruling, we disagree. We are persuaded that these documents, including the various agreements, are conclusive proof that the patented invention was on sale prior to the critical date. To the extent that this conclusion rests on factual findings, the district court clearly erred.

system beyond the statutory term. *King Instrument,* 767 F.2d at 860, 226 USPQ at 407. Accordingly, while what an offer or sale discloses to the public may tend to show whether the invention was on sale, the question is not whether the public knew of the invention, but whether the product sold or offered embodies the invention claimed. *Id.* ("purchaser need not have actual knowledge of the invention for it to be on sale"). Indeed, an offer or sale may invoke the statutory bar "even though *no* details are disclosed." *RCA Corp. v. Data General Corp.,* 887 F.2d 1056, 1060, 12 USPQ2d 1449, 1452 (Fed.Cir.1989). Here, we have no doubt that Ferag did attempt to commercialize its invention in 1979, well before the critical date.

The district court cited *Envirotech* as support for its rule that "the patent owner must intend and the customer must understand at the ti[m]e of the sale that the invention is included in the product being sold." *Ferag,* slip op. at 25. The court misread *Envirotech.*

Envirotech owned a patent on a ballasted digester cover for use in wastewater treatment. The patented cover was a "hydroballaster" in which the cover floated on the surface of gases released during treatment of sewage, held in place by ballasting around the lower rim. Prior art devices had a more expensive fixed cover design.

The alleged offer was Envirotech's proposal to supply a digester cover to the general contractor on a city water treatment project. Envirotech conceded that it hoped to supply its patented hydroballaster cover, and it bid based on the lower cost of that design. Its proposal, however, made no mention of the new design, instead referencing the project specifications, which called for the old fixed cover. The district court found the patent invalid based on Envirotech's ultimate plan to use the hydroballaster on the project.

We reversed. We agreed that the on sale bar focuses on the inventor's attempt to commercialize his invention, but held that "the inventor's attempted exploitation must be objectively manifested as a definite sale or offer to sell the invention. The subjective, uncommunicated, and ultimate intention of the offeror, however clear, is not alone sufficient."

904 F.2d at 1575, 15 USPQ2d at 1233. Rejecting the district court's reliance on uncommunicated intent, we observed that Envirotech's bid documents specified the prior art design, and not the patented invention. Had the contractor chosen to refuse the suggested substitution, Envirotech would have been compelled to provide the prior art digester cover. We said "[w]hile there is no requirement that the purchaser have actual knowledge of the invention to invoke the on sale bar, what the purchaser reasonably believes the inventor to be offering is relevant to whether, on balance, the offer objectively may be said to be of the patented invention." *Id.* at 1576, 15 USPQ2d at 1234 (citation omitted).

The key question in *Envirotech,* and in the case before us today, is whether, under the totality of the circumstances, the inventor placed his invention on sale, objectively manifested by a sale or offer for sale of a product that embodies the invention claimed in the patent. We emphasize that this is an objective test, and that at its heart lies the inventor's attempt to commercialize the invention. The district court mistakenly relied on the seller's intent and the purchaser's understanding. But the measure of the bar is what was offered, not the patentee's intent. *Envirotech* recognized this, and turned on the determination that Envirotech's proposal offered only the prior art design.

It may be true that no one at Bergen knew that Ferag would supply a conveyor system within the claims of the patent, but here that lack of knowledge cuts in the opposite direction it did in *Envirotech.* There, the purchaser understood the proposal to specify the prior art digester cover design. That understanding was some evidence to support the conclusion that Envirotech's offer encompassed the prior art design. Here, Bergen may not have known that Ferag would supply the patented grippers, but neither did it have reason to expect to receive an old gripper design. This tells us nothing about what Ferag offered to Bergen. Accordingly, we must look elsewhere for objective evidence of what the subject matter of the Bergen sale was.

The March partnership agreement reveals Ferag's plan to showcase its new products at the Bergen facility. Its terms clearly include a contract for sale of a conveyor system, but it is not clear just what conveyor Ferag would supply. Indeed, the record suggests Ferag had not even begun development of the patented conveyor by that time. But the agreement did set forth functional specifications that the conveyor would meet. An existing prior art conveyor could have met these specifications, but the claimed conveyor, when it was developed, met them as well. What is clear, based on the November order confirmation, is that by November of 1979 Ferag had decided to supply the patented conveyor pursuant to its agreements with Bergen.

Taken together these documents reveal attempts by Ferag, manifested in both its transaction with Ferag, Inc. and the sale to Bergen, to commercialize the invention by November of 1979. Ferag does not suggest that it was engaged in experimentation or that it was otherwise justified in waiting for over a year before applying for a patent on the conveyor system. Therefore, under the totality of the circumstances, we conclude Ferag placed the invention on sale before the critical date of January 15, 1980, and the patent is invalid under 35 U.S.C. § 102(b).

### Conclusion

Accordingly, the judgment of the United States District Court for the Southern District of Florida is reversed.

*REVERSED.*